Richard C. Miller, F0458
BANES HOREY BERMAN & MILLER, LLC
Suite 201, Marianas Business Plaza
P.O. Box 501969
Saipan, MP 96950
Tel.: (670) 234-5684
Fax: (670) 234-5683
Email: RMiller@pacificlawyers.law

*Attorneys for Plaintiffs*

FILED
Clerk
District Court
JUL 26 2021
for the Northern Mariana Islands
By_____*JY*._____
(Deputy Clerk)

## IN THE DISTRICT COURT
## FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| MOHAMMAD ARMAN, ABUL KALAM AZAD, KOWSAR HALIM, AND HABIBUR RAHMAN,<br><br>Plaintiffs,<br><br>v.<br><br>JN SAIPAN CNMI, LLC, BIG BOY MARINE SPORTS INC., MD. JASHIM UDDIN, AND NASMUN NAHAR FATEMA,<br><br>Defendants. | Case No. 1:21-CV-**00024**<br><br>**VERIFIED COMPLAINT AND JURY DEMAND** |

### INTRODUCTION

Plaintiffs Mohammad Arman, Abul Kalam Azad, Kowsar Halim, and Habibur Rahman complain against Defendants JN Saipan CNMI, LLC, Big Boy Marine Sports Inc., Md. Jashim Uddin, and Nasmun Hanar Fatema for violations of the federal Fair Labor Standards Act ("FLSA"), breach of contract, fraudulent misrepresentation, quantum meruit and unjust enrichment. Defendants enticed Plaintiffs to come to Saipan to work for them under the CW-1 visa program, fraudulently extracted exorbitant recruitment fees from them, intentionally withheld earned wages from them for long periods of work since 2017, and threatened to have

them deported if they complained about their treatment or the recruitment fees. Plaintiffs further allege as follows.

## JURISDICTION

1. The Court has federal question jurisdiction over the FLSA claims under 28 U.S.C. § 1331 and 29 U.S.C. § 216(b). The Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a).

2. Venue is proper in the District for the Northern Mariana Islands pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

3. All Plaintiffs are citizens of Bangladesh and were admitted to the United States in 2016 under the CW-1 nonimmigrant visa program.

4. Defendant Big Boy Marine Sports Inc. ("Big Boy") is and was, at all times relevant, a corporation incorporated in the Commonwealth of the Northern Mariana Islands ("CNMI") and having its principal place of business in the CNMI.

5. Defendant JN Saipan CNMI, LLC ("JN Saipan") is and was, at all times relevant, a limited liability company registered in the CNMI and having its principal place of business in Saipan, CNMI. Per its 2017 Annual LLC Report, its members are Md. Jashim Uddin ("Uddin"), Nasmun Nahar Fatema ("Fatema"), and Fahim Shahria Uddin ("Fahim"). The 2017 Report lists Uddin as President/Secretary, Fatema as Vice-President, and Fahim as Treasurer.

6. Defendants Md. Jashim Uddin and Nasmun Nahar Fatema are and were, at all times relevant, citizens of Bangladesh and residents of Saipan, CNMI.

7. Fatema is Uddin's wife, and Fahim is Uddin and Fatema's son.

2

## FACTS

### Background Facts as to All Plaintiffs

8. The CW-1 CNMI-only transitional worker visa classification allows employers in the CNMI to apply for permission to employ foreign workers who are otherwise ineligible to work under other nonimmigrant worker categories.

9. To qualify under the CW-1 program, employers must obtain a temporary labor certification from the U.S. Department of Labor ("USDOL"), be engaged in a legitimate business as defined by regulation, and comply with all federal and CNMI employment requirements, including the FLSA's minimum wage and overtime requirements.

10. In 2015, Fatema and a man named Firoz Alam contacted each of the Plaintiffs in Bangladesh and recruited them to come to work in Saipan for her husband, Uddin.

11. Defendants demanded steep recruitment fees from each Plaintiff, ranging from $12,500 to $15,000.

12. Fatema did the paperwork for Plaintiffs' CW-1 visas.

13. The company that petitioned for Plaintiffs was Big Boy Marine Sports Inc. ("Big Boy").

14. At the time, Uddin was a manager for Big Boy.

15. In or about November 2015, each Plaintiff signed an employment contract with Big Boy to clean vehicles and equipment in Saipan.

16. Azad, Halim, and Rahman arrived in Saipan on May 30, 2016. Alam arrived on August 8, 2016.

17. Fatema accompanied Azad, Haim, and Rahman on the flights to Saipan. She gave each of them an envelope with $8,000 to put in their carry-on luggage. After they passed immigration inspection at the Saipan airport, she confiscated all the cash.

3

18. The next day, Uddin took the men to the Social Security office to apply for Social Security cards. He told them that if asked about a recruitment fee, they should deny they paid any and say that JN Saipan paid all the visa-processing and travel costs.

19. When the men's Social Security cards were issued, Uddin confiscated them

20. Plaintiffs initially were housed in a two-room apartment in San Vicente village. There were three men (Plaintiffs plus two others) to each small room, and not enough beds to go around.

21. Uddin would not let Plaintiffs go to the local mosque unaccompanied, for fear that other Bangladeshis would ask them about their situation. When Uddin accompanied them to the mosque, he warned them not to mention to anyone that they had paid a recruitment fee.

22. When the landlord in San Vicente kicked Plaintiffs out for nonpayment of rent, Uddin moved them to an abandoned barracks in Garapan, where the four of them shared two small, windowless rooms with two other men.

23. After moving to the Garapan barracks, Uddin only occasionally found work for Plaintiffs bush-cutting or house-cleaning. Only then would Uddin give the men some cash to buy food. Much of the time, the men were starving.

24. Since 2017, Plaintiffs have endured long periods where there were not taken to a job site, were given no work, and received no pay.

25. Uddin extorted additional fees from Plaintiffs to renew their CW-1 permits, but the permits were not renewed and on information and belief Uddin never petitioned USCIS to renew them.

26. On January 21, 2021 Plaintiffs filed complaints against Uddin and JN Saipan with the CNMI Department of Labor.

27. About two weeks later, Fatema visited Plaintiffs' homes in Bangladesh and made threats to have Plaintiffs thrown in jail in Saipan unless Plaintiffs dropped their cases.

### *Mohammad Arman*

28. In June 2015, in Bangladesh, a man named Firoz Alam ("Alam") told Arman's parents that Uddin was hiring workers to come to the United States to work in a car wash company.

29. Alam promised full-time work at $6.05 an hour plus overtime. He told them that Arman would earn between $1,250 and $1,800 a month.

30. Fatema also came to Arman's parents' house and promoted the offer as a great opportunity for their son.

31. In March 2016, Fatema told Arman that his CW-1 had been approved.

32. On March 16, 2016, Fatema took Arman to the U.S. Embassy for a visa interview, and Arman's visa was approved.

33. On April 10, 2016, Arman's parents paid Uddin's mother $12,500 in cash.

34. Defendants never repaid Arman for visa processing and inbound transportation and subsistence.

35. Arman arrived in Saipan on August 8, 2016. Uddin, Fatema, and Alam picked him up at the airport and drove him to an apartment house in San Vicente, where Arman had to share a small room with two other men who had arrived in May.

36. At the San Vicente apartment, Uddin confiscated Arman's passport and CW-1 visa.

37. The apartment had two rooms for six men. There was no bed for Arman and he had to sleep on the floor.

38. In the first weeks after his arrival, there was no work for Arman and the other men in the apartment.

39. In or about April through June 2018, Uddin gave Arman work at JN Saipan as a security guard and briefly working construction at the Best Sunshine site. Uddin only occasionally gave Arman money to cover Arman's rent payment and to buy food. Altogether from that period of work, Arman earned more than $12,000 in full-time and overtime wages that he was never paid.

### *Abul Kalam Azad*

40. In June 2015, Azad ran into Firoz Alam, a former schoolmate of Azad, at his village's market in Bangladesh.

41. Alam told Azad that Uddin was hiring workers from Bangladesh for his car wash business in the United States and could give Azad a minimum of 80 hours of work every two weeks at $6.05 an hour, plus time-and-a half for overtime. He told Azad that the price would be a fee of $15,000.

42. After discussing the offer with his parents, Azad accepted the offer and gave Alam his passport for processing the visa application.

43. In November 2015 Azad borrowed 200,000 takas, equal to around $2,500, and gave the money to Alam.

44. In March 2016, Alam introduced Azad to Fatema, who told Alam that his CW-1 was already approved.

45. On March 16, 2016, Fatema took Azad to the U.S. Embassy for a visa interview, and Arman's visa was approved.

46. Fatema confiscated Azad's passport and asked Arman to pay the balance of the recruitment fee.

47. On May 5 and 10, 2016, Azad deposited most of the balance in Fatema's bank account and paid her the remaining balance in cash the day before they left Bangladesh.

48. Upon arrival in Saipan on May 30, 2016, Uddin confiscated Azad's passport and visa and CW-1 papers.

49. Defendants never repaid Azad for visa processing and inbound transportation and subsistence.

50. Once he was in Saipan, Defendants provided Azad with work in different companies as a manpower worker.

51. In 2017 and 2018, Defendants extorted $500 per year (a total of $1,000) from Azad to cover CW-1 renewal fees.

52. From late December 2017 through September 2018 Azad worked full-time and overtime – extra hours during the workweek as well as weekends -- for Uddin and JN Saipan and never received a paycheck from them.

53. Defendants owe Azad more than $30,000 in back wages from late December 2017 through September 2018.

### *Kowsar Halim*

54. Halim is Uddin's nephew. Uddin is his mother's elder brother.

55. In August 2015, Uddin's wife, Fatema, on a visit to Bangladesh, came to Halim's house and told his parents that Uddin could provide Halim with a good job in Saipan, at a good salary, and eventually a green card (lawful permanent residence) and U.S. citizenship.

56. Specifically, she said Uddin would hire Halim to work at a car wash, there would be a minimum of 80 hours of work every two weeks, earning the federal minimum wage and time-and-a-half for overtime. His parents asked Fatema to tell Uddin to hire me.

57. Uddin contacted Halim's parents and told them that he would charge a recruitment fee of $12,500.00. He told them that Halim would be able to work off the recruitment fee in 6–7 months, that he would renew Halim's visa every year for three years, after which he would arrange a green card for him. Halim and his parents agreed.

58. In September 2015 Halim gave his passport and birth certificate to Fatema. Fatema applied for a CW-1 visa for him.

59. On March 16, 2016, Fatema brought Halim to the U.S. Embassy in Dhaka for a visa interview. After Halim got the visa, Fatema seized it and kept it.

60. On April 10, 2016, Halim's parents paid $12,500.00 in cash to Uddin's mother, Firoza Begum, who then gave the cash to Fatema as per Uddin's instructions.

61. On or about May 30, 2016, Halim flew to Saipan together with Fatema and four other CW-1 workers (including Plaintiffs Azad and Rahman).

62. Uddin picked them up at the Saipan airport and brought them to an apartment in San Vicente village. There, Uddin confiscated their passports and CW-1 papers.

63. Halim's first job for Uddin was on a construction project. He worked 45 days straight, with no days off. Uddin refused the men's request for a rest day on Friday, the Moslem holy day, and forced them to work on Fridays the same as the other days of the week.

64. Uddin deducted from their paychecks his alleged expenses for the men's rent and meals, although in fact he brought them very little food to eat.

65. When the construction job ended after 45 days, the men were without work, but Uddin would not let them leave the apartment house, even to go to the mosque, for fear that other Bangladeshis would ask questions and the men would mention the recruitment fee. Eventually, he agreed to take the men to the mosque himself but would not allow them to talk to others.

66. Later, Uddin gave Halim a job as a security guard for about 4 months. Halim worked 8 hours a day, 6 days a week, but Uddin did not pay him overtime wages.

67. After the security guard job ended, Halim was without work for about 5 months. He and the other workers living together – including Plaintiffs Arman, Azad, and Rahman – had no money to pay rent or buy food. When he complained, pointing out that he'd paid Uddin a recruitment fee and been promised continuous work, Uddin told Halim his visa had already expired and threatened that if Halim complained to authorities he would call Homeland Security and have Halim thrown in jail and deported. Halim couldn't risk being sent back to Bangladesh until he'd earned enough money to repay loans that his family had taken out for the recruitment fee.

68. From April 2017 through February 2019, Uddin gave Halim work as a security guard for JN Saipan. Other than money to pay rent and buy some food, Defendants did not pay Halim his wages. Defendants owe Halim close to $50,000 in wages for work during this period.

69. In 2017, 2018, and 2019, Halim paid Uddin a total of $3,000 to renew his CW-1 permit. On information and belief, Uddin never submitted renewal applications to USCIS.

70. When in March 2019 Halim pleaded with Uddin to give him his CW-1 permit so that he could look for work with another company, Uddin gave him a fake CW-1 permit

showing the employer as Ipwan Security Service; the date of birth on the permit did not match Halim's.

### *Habibur Rahman*

71. In June 2015, Fatema came to Rahman's house in Bangladesh and told his parents that Uddin was looking to bring workers from Bangladesh to work for his car wash company in the United States. When the family expressed interest, they spoke on the phone with Uddin, who offered full-time employment at the federal minimum wage of $6.05 an hour plus time-and-a-half for overtime. Uddin promised to renew the visa for three years and then he would arrange a green card for Rahman.

72. Uddin charged a recruitment fee of $12,500 and told Rahman's parents he would earn enough in 6–7 months to pay off the fee.

73. When Rahman and his parents agreed, Fatema and Firoz Alam took his passport for the visa application.

74. On March 16, 2016, Fatema brought Rahman to the U.S. Embassy in Dhaka for a visa interview. After Rahman got the visa, Fatema seized it and kept it.

75. On April 10, 2016, Rahman's mother gave $12,500 in cash to Uddin's mother, Firoza Begum, who then gave all the case to Fatema.

76. On May 30, 2016, Rahman arrived at Saipan airport together with four other workers and Fatema.

77. Uddin picked them up at the Saipan airport and brought them to an apartment in San Vicente village. There, Uddin confiscated their passports and CW-1 papers.

78. When Rahman and the other workers asked Uddin about their employer and the company, Uddin got mad at them and didn't answer.

79. After 45 days' work at a construction site ended, Rahman was without work, and Uddin did not provide any. When Rahman demanded that Uddin give him the job that he'd come to the United States to do, Uddin told him that his visa was already expired.

80. Uddin did not put Rahman to work as a security guard for JN Saipan. The only work he gave Rahman was occasional house-cleaning and bush-cutting. Uddin would sometime give Rahman $20 or $30 to buy food but didn't give him a regular paycheck or have Rahman submit time sheets.

81. In 2017, Rahman paid Uddin $1,000 in cash to process his CW-1 renewal, but his CW-1 was not renewed.

82. Defendants owe Rahman more than $6,000 in back wages.

## FIRST CAUSE OF ACTION
### Violation of Fair Labor Standards Act for Failure to Pay Minimum and Overtime Wages
### (All Defendants)

83. All foregoing allegations are realleged and incorporated by reference as if set forth fully herein.

84. The FLSA requires covered employers to pay non-exempt employees a regular wage that is no less than the minimum wage, and no less than one-and-a-half times their regular pay rate for hours worked in excess of 40 hours in a workweek.

85. On September 30, 2016, the federal minimum wage in the CNMI was set at $6.55 an hour. On September 30, 2017, it rose to $7.05 an hour, and on September 30, 2018, it rose to $7.25 an hour.

86. Late payment – the failure to issue employees their paychecks promptly when due – violates the FLSA and triggers FLSA provisions concerning liquidated damages and prejudgment interest.

87. Pay period after pay period, sometimes for months on end, Defendants failed to give Plaintiffs a regular paycheck or provide them with regular pay stubs.

88. The recruitment fees that Plaintiffs paid at Defendants' direction were an impermissible deduction that lowered the pay they received below the minimum wage.

89. Defendants' actions and omissions as alleged herein were willful and knowing violations, in bad faith, of the FLSA's provisions for payment of regular wages and overtime wages.

90. Under the FLSA, 29 U.S.C. § 216(b), Defendants are liable to pay an additional equal amount as liquidated damages, interest, reasonable attorney fees and the costs of this action.

## SECOND CAUSE OF ACTION
### Breach of Contract
### (Defendant Big Boy Marine Sports, Inc.)

91. All foregoing allegations are realleged and incorporated by reference as if set forth fully herein.

92. In the employment contract that Big Boy entered into with each Plaintiff, Big Boy agreed to hire Plaintiffs as cleaners of vehicles and equipment, at the minimum wage rate plus 1.5 times that rate for overtime, and guaranteed not less than 40 hours of work per week, for a term of 12 months.

93. However, except for a few weeks when Halim worked for Big Boy as a security guard, Big Boy never provided Plaintiffs any work.

94. At all times under the contract, Plaintiffs were in Saipan and were ready, able, and willing to work for Big Boy.

95. Big Boy breached the employment contracts by failing to provide Plaintiffs with at least 40 hours of work per week for 12 months.

96. Big Boy did not terminate any of the employment contracts for cause or for economic necessity or took any other action that would excuse its performance under the contract.

97. Because of Big Boy's breach, Plaintiffs sustained expectation and reliance damages equal to wages from full-time employment at the minimum wage for 12 months.

### THIRD CAUSE OF ACTION
### Fraudulent Misrepresentation
### (All Defendants)

98. Defendants Uddin and Fatema fraudulently induced Plaintiffs to come to Saipan and to pay them thousands of dollars in recruitment fees by promising them full-time work sufficient to pay back those fees within a few months and immigration status that would lead to lawful permanent residence in the United States.

99. Defendants Uddin and Fatema made these fraudulent representations as agents of Defendants JN Saipan and Big Boy and with JN Saipan's and Big Boy's knowledge.

100. Defendants knew that they could not provide Plaintiffs with full-time work.

101. Defendants intended for Plaintiffs to act in reasonable reliance on their fraudulent misrepresentations, so as to extract exorbitant recruitment fees from them.

102. Plaintiffs justifiably and reasonably relied on Defendants' misrepresentations.

## FOURTH CAUSE OF ACTION
### Unjust Enrichment and Quantum Meruit
### (Md. Jashim Uddin, Nasmun Nahar Fatema, and JN Saipan CNMI, LLC)

103. Defendants Uddin, Fatema, and JN Saipan received benefits from Plaintiffs in the form of tens of thousands of dollars in recruitment fees extracted by promises of long-term employment in the United States and eventual green cards, and services that Plaintiffs performed for which Defendants failed to compensate them.

104. Plaintiffs had a reasonable expectation to be compensated for the goods and services they provided to Defendants.

105. Defendants have been unjustly enriched by the benefit of Plaintiffs' uncompensated labor as well as the recruitment fees.

### ALTER EGO THEORY OF LIABILITY

106. On information and belief, JN Saipan, although registered in the CNMI as a limited liability company, is but an instrument that Defendants Uddin and Fatema, who own 90 percent of the shares, use to conduct their own personal business.

107. On information and belief, Uddin and Fatema's interests are so intertwined with those of JN Saipan that the LLC is Uddin and Fatema's alter ego and for purposes of liability it would be an injustice to treat JN Saipan as separate from Uddin and Fatima.

108. The most recent Annual Report for JN Saipan on file at the CNMI Department of Commerce is for 2017 and was filed more than three years ago.

109. On the occasions when Plaintiffs worked for JN Saipan and were actually paid, they did not receive paychecks drawn on a JN Saipan bank account but were paid in cash by Uddin.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1. A declaration that Defendants have willfully and in bad faith violated the applicable minimum wage and overtime wage provisions of the FLSA and regulations implementing the FLSA;
2. All damages available under the FLSA;
3. A declaration that for purposes of liability JN Saipan is not a separate entity from Uddin and Fatema;
4. Compensatory, expectation, and reliance damages for breach of contract;
5. Restitution for unjust enrichment;
6. Reasonable attorney fees as provided by the FLSA as well as the costs of this action;
7. Such further relief as the Court deems proper.

## JURY DEMAND

Plaintiffs demand a jury trial pursuant to the Seventh Amendment to the Constitution and Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted this 23rd day of July, 2021.

BANES HOREY BERMAN & MILLER, LLC
Attorneys for Plaintiffs

by Richard C. Miller, F0458

**VERIFICATION**

We, Mohammad Arman, Abul Kalam Azad, Kowsar Halim, and Habibur Rahman, declare under penalty of perjury that the foregoing Complaint is true and correct to the best of our knowledge.

_____   Date: 07-23-2021
Mohammad Arman

_____   Date: 07-23-2021
Abul Kalam Azad

_____   Date: 7,23,2021
Kowsar Halim

_____   Date: 07.23.2021
Habibur Rahman

I, Md. Abdul Mabud, am competent to translate from English to Bengali and certify that I orally translated the foregoing Complaint 4622-01 for the above-named Plaintiffs.

_____   Date: 07.23.2021

Contact information: 670-783-2899